We'll call our last case for the morning, Emilio Perez-Muñiz v. Atty. Gen. May it please the Court, I'm Francis X. Geyer. I represent the petitioner Luis Emilio Perez-Muñiz. I'd like to reserve five minutes for rebuttal, Your Honor. That's granted. If you could either raise your voice or lower the mic. Okay. I apologize, Your Honor. That's better. Is that better? Better. Thank you. Thank you, Your Honor. Your Honors, this is a case about Mr. Perez's right to a meaningful opportunity for a hearing on his asylum application being violated by the IJ's rigid focus on the case completion goals of the United States Department of Justice. Mr. Perez entered the United States at the age of 12. He was placed in proceedings in 2001 and was attempting to apply for a form of relief called NACARA, which is a very straightforward form of relief that would have enabled him to receive a green card. The case went on. There were three different judges who were on the case. Finally, in May 2006, it was discovered by Mr. Perez that he did not meet the eligibility requirements for NACARA. At this time, in May 2006, Mr. Perez requested that he be allowed to reinstate his asylum application, which he had previously waived. That was permitted, right? I'm sorry, Your Honor? That was permitted, right? Yes, yes. Mr. Perez was allowed to reinstate his asylum application, perhaps because, as the judge conceded on the record, she had not elicited a knowing voluntary waiver of or withdrawal of the asylum application from Mr. Perez. On the record, she had actually just had the Given that, can you speak to the central point, please, of the IJ's decision? I understood the IJ to make two points that are, at least in my mind, crucial for you to address. One is that the evidence before her was such that there was no way to say who had killed the petitioner's father and uncles. And because there was no way of knowing who, you couldn't say that that was the government or someone the government was unwilling or unable to control. And therefore, you couldn't have a future persecution claim. And second, and as a function of that, since you didn't know who, you couldn't know why. And since you couldn't know why, you couldn't tie it to any persecution on account of being a member of a group, etc. In what way was the IJ's decision lacking in substantial evidence to reach those two conclusions? Your Honor, I'll answer that with two points. Number one, there was, we submit, there was circumstantial evidence that the motives for the murder of the petitioner and his uncles had been the fact that they had all served in the Guatemalan military. Circumstantial evidence, we concede. The other point, Your Honor, is that, and this is where we get to our due process, Hashmi issue. Due to the IJ's focus on complying with the case completion goals, she made it very clear that she wanted to have this case adjudicated. I'm with you. I understand the argument. Let's just set that aside for a second because that is a separate argument, right? Let's just let that aside for a second and focusing on the IJ's, the two decisions that she did make, is the record such, let me ask it this way, can you point to the evidence that compels the conclusion? Because that's what we have to do. It's not simply that you could draw a different conclusion from the IJ. The evidence in the record has to compel a conclusion other than the IJ reached. What evidence are you relying on to say, look, this is where you have to go? Your Honor, the fact that the petitioner and his uncles had, the petitioner's father and uncles had all served in the Guatemalan military and the fact that it was indicated in the testimony of the petitioner's mother that she suspected that the guerrillas were, the Guatemalan guerrillas were responsible for the petitioner's father's kidnapping, which occurred in 1988 due to a note that was left at the scene, we submit that this is circumstantial evidence of the identities and the motives of the person. Do you get to the daughter's return and that situation? How does that bear? That bears on the well-founded fear of persecution, that conditions had not changed in Guatemala and were such that when the, when Mr. Perez's sister returned to Guatemala to identify the father's body, she was given or she received two notes threatening her. She went to the authorities about them. The authorities advised her to leave the city where she had been right away. Well, that to me might go to the unwillingness to control because instead of saying, oh, okay, well, we're going to continue this investigation that we were going to continue, they basically whisked her out of town to the airport and said be done with it. But I think there's a, with respect to the motive, I mean, the IJ said he wanted to know who, or she wanted to know who. I don't know that it's so much who, but it definitely is why. And you offer a plausible answer to that. The IJ I think said it could be coincidence. There's probably much more than coincidence. There's probably something going on here. But do we know that it's not a family feud with, you know, the McCoys and whatever? Do we know, or is there something that really points toward, aha, it was on account of there being, you know, children of military or family, or do we know what it's on account of? Your Honor, in terms of perhaps being a family feud, the petitioner and his mother and sister all testified that there are no remaining family members in the country. So as far as the other question that you asked, this is where I think the due process issue becomes almost inseparable from the issue with regard to the identities and motives of the individuals who are responsible for the murder of petitioner's father and uncles. As I was stating, the IJ citing, at the moment that she agreed to reinstate Mr. Perez's application, allowed Mr. Perez only two weeks to prepare for his hearing and to submit an updated asylum application as well as supporting documentation. We submit, Your Honor, that had Mr. Perez had additional time, had the IJ complied with this court's holding in Hashmi v. Attorney General that says that the IJ may not have this exclusive focus on the case completion goals. How can you say it was an exclusive focus when the IJ said more than once, look, if you need more time, I'll give you more time. The important thing here is to see that we do this right. Those are not direct words, but that's certainly the import of the things that the IJ said when scheduling this. In the face of those comments on the record, how can you say that this is like Hashmi where it was a heedless rush to meet those goals? Well, Your Honor, I would submit that the IJ's focus on the case completion goals runs throughout the record, and although the IJ did make it clear several times, I agree with you, that she was trying to maintain due process, I submit that nevertheless, by allowing Mr. Perez only two weeks to... He'd had years. At that point, by his own account, he'd had years, right? Well, his... I'm sorry, I thought he actually wanted this hearing. Your Honor, his application had been pending for years. However, Mr. Perez was focusing as his first form of relief on Nicara. So he wasn't perhaps as diligent in preparing for the asylum because Nicara is a much easier form of relief to acquire. When did he realize that he was going to have to proceed with asylum? That was in May 2006, Your Honor. That was the next to last hearing that he had. Now, Your Honor, had the IJ asked for all of the documents to have been submitted at once and all the applications to have been submitted all at one time, I would agree with you. But in this case, there was kind of a piecemeal approach to the forms of relief that at least that was what was taken by the third IJ. Well, his first hearing was scheduled for April 19, 2002. Before, I guess, he was saying, I want to go with Nicara. I mean, so at some point in time, as early as 2002, he was planning to or should have been planning to make his pitch for asylum, right? So I'm having a hard time when you say he only had two weeks. He had anticipated making a case years earlier. What was wrong about the IJ saying in that context, particularly saying, but we'll give you more time if you need it, let's go ahead now that we're back on asylum and schedule this hearing and move it forward? Well, as I stated, Your Honor, it has to do with the approach the IJ took to the case, which was application for application. Now, had the IJ taken the approach that I want all the applications and supporting documents at once, I think it would have been a different case. But given the approach the IJ took, I don't believe it was unreasonable for Mr. Perez to attempt to submit the documentation to support one form of relief and then use his alternative later should it be needed. All right. We'll hear from you on rebuttal. Thank you. Good morning. May it please the Court, I am Sharon Clay, Counsel for the Attorney General. As previously discussed, the record evidence as presented fails to compel the conclusion that Petitioner has well-founded fear of persecution upon his return to Guatemala. Now, the witnesses were found to be very, very credible. Is that correct? That is correct. I mean, there's just no doubt here. It's a very unusual record from that standpoint. Yes, that's correct. However, there's a failure of the sufficiency of the evidence. Well, but there was the mother saw a note left by the father's kidnappers to profess support for the FARC. Why does that not constitute enough to establish a motive that these were anti-Guatemala military people associated with Marxist, you know, the revolutionary guerrillas? And all of the members of this family have been killed. If you were headed back there, would you not have a real fear that this was going to happen to you because these people definitely didn't like this family? You are correct. However, the flyer that was found at the time that the father was kidnapped was too remote in time for the immigration judge to make the assessment that there were guerrillas involved in the 1998 murder of his father. With regard to Petitioner's fear of persecution, we would not say that he doesn't have a subjective fear of potential harm because he has lost a father and two uncles, but he doesn't know where that fear comes from. In order for him to merit relief in the immigration context, he has to establish that the persons whom he fears are the government or forces the government is unable to control. He must also establish their motive for the actions against their father. And unfortunately, a note left at the scene of a kidnapping in 1988, when the father has been retired from the Civil Patrol since 1983, it's far too remote for the immigration judge to be persuaded that he has a reasonable fear of guerrillas in 1998 or today. In addition to that, the country reports in 2006 has no indication that there are any issues with regard to guerrilla activity. Strangely... You didn't refer, or the IJ didn't refer to the country reports? No, but I'm just giving supplemental information in the record in terms of... And I was under the impression that country reports actually bolstered the concept that there still was a great lack of stability in the country. That is true, but it's not by the guerrillas. It's actually the government. It's the PN or the PNC. There's a lot of social violence in general. However, they're not implicating the government in terms of his persecution. They're actually implicating the guerrillas. Since the 1996 peace accords, the guerrillas have actually acquired status in the political party at guerrilla. And strangely, FARC, which is a guerrilla organization, was not originated in Guatemala. Actually, the FARC is a guerrilla group that's in Colombia with limited reach into... Is there any evidence that the FARC is active or has a presence in Guatemala? Nothing in the record. FARC is not even mentioned in the case other than the mother's speculation that the FARC had something to do with the husband's kidnapping in 1988. What's your position, if the government has one, on whether children of the Guatemalan military constitute a social group within the meaning of the INA? At this point, I don't believe there's any evidence to show that family members of persons who have served in the civil patrol are considered members of a particular social group. Is there any evidence that other people, other families have had to deal with the kinds of things that the Perez Muniz family has had to deal with? No. There's been no evidence presented of other family members experiencing the persecution from the guerrillas or the FARC as family members of the civil patrol. How about the family as a particular social group? Fourth Circuit in the Lopez Soto case talks about that. Wouldn't that apply here? Yes. I mean, the government and the courts have held that family members have been known to be a particular social group for purposes of asylum. However, the facts in this particular case don't lend itself to establishing the proper nexus for it to be found here. Do you have any additional questions with regard to? The NIJ seemed intent on requiring the knowledge of exactly who the persecutors were. Is that really necessary? I mean, it would seem there has to have been persecution on account of something so you can identify a motive. But if there are several groups or individuals or people that would have that motive, do you have to be specific as to exactly who did it? Yes, you do have to know who because it still has to be the government or forces the government is unable to control. But in addition to that, it does have to be on account of a statutorily protected ground. Well, but it could be the government's unwilling to control. I mean, just – and I would think the evidence here of them spiriting her away, they didn't want to pursue this investigation anymore. They just wanted to be done with it. I mean, how much evidence do you need? Well, given the fact that the threats were anonymous and actually the statement by the sister on trial was that the government protected her from potential harm while she was there. So in essence, even assuming she had an identity, petitioners under these set of facts can't even show that the government was unwilling or unable to protect her within Guatemala. Again, with regard to his statutorily enumerated grounds, if you don't have the identity of the persecutor, you can't assume or speculate as to any opinion that person may have had about Mr. Muniz's father or any opinion he may have or imputed to Mr. Muniz himself. Again, the identity and emotive of the perpetrator is crucial to the critical elements of establishing his claim for asylum, and he has failed to do so in this case. Although if a note were left, you know, death to all children of Guatemalan military, you know, you don't know who it is, but you certainly know they are opposed to the Guatemalan military. Isn't that enough? It would be, but that's not the fact of this case. There are clandestine groups where you can establish membership, where even where the identity is not known, you can still show that there's persecution, but the facts in this case do not lend itself to that. Closing. In closing, I would just like to say, I don't know if you want me to address the due process issue, but just as the justices have noticed, the immigration judge did give him ample opportunity to continue their case. Petitioner has been represented by counsel since 2001. They were prepared to go to trial in 2002 when he failed to appear and was ordered removed in absentia. Since that time, not one of his counsel has appeared before the court and requested a continuance, which distinguishes this case from Hashimi, which is a case counsel has raised to support his claim. There's been no denial of continuance in this case, and it's been made clear on more than one occasion that the immigration judge was willing to continue the case if, in fact, they had presented information or evidence or suggested or identified the type of evidence they could have put forward to support his claim. I'm drawing a blank, but why is he, what did he do whereby we are sending him away? Here unlawfully because? Yes, present unlawfully without having been admitted or paroled. How did he get here? His mother brought him here. He was apparently a part of a derivative NACARA application. According to the transcripts, it was denied based on an entry date. For whatever reason. Any fraud or violence or crimes or anything? No. Yes, and it does present an unfortunate set of circumstances. It does present a very unfortunate circumstance. Yes, it does. And there's no way the government can say this is an unusual case? I don't know. I just represent the Board of Immigration Appeals. There may have been, you know, I don't know. There's no humanitarian asylum based on his past experiences there, but I really don't know. I can't speculate as to what. I mean, usually we have, you know, people who presented a fraudulent passport or committed a crime of violence or some reason why, you know, you say, okay, you're not deserving to be here, but. True, but a grant of asylum is based on extreme circumstances. When the United States government decides to step in and protect citizens from its own government, there has to be a basis for that because otherwise everyone would be here. And how many people are here similarly situated? Probably a whole lot. Millions. Millions. Thank you. Your Honors, I'd just like to respond, if I may, to the Respondent's argument that this case is distinguishable from Hashmi. As I read Hashmi, it does stand for the proposition that the IJ must consider the facts and circumstances of the individual case in using the judicial calendar. So I submit, Your Honors, that some of the basic documents that could have put a bit more meat on this case could have been submitted by Mr. Perez had he been given more than two weeks. Was that ever tendered? Was there ever any kind of an effort or application to supplement the record to say, if you'd please reconsider in light of this additional evidence? Did that occur? No, Your Honor. However, there were just some basic questions that could have been answered. The IJ asked Mr. Perez's sister about the status of the murder investigation of Mr. Perez's father. Certainly, we could have gotten evidence about that from the police in Guatemala. However, of course, it's going to take more than two weeks to get that kind of evidence. There also could have been perhaps evidence regarding the military service of Mr. Perez's father and uncles and exactly what they did, where they did it, when they did it. So the case could have been fleshed out a great deal more. We submit that the evidence available establishes by substantial evidence that Mr. Perez qualified for asylum. But had Mr. Perez had additional time, it could have been an even stronger case. All right. Thank you. Thank you. Take it under advisement. It was well argued. We'll ask the clerk to recess the Court. All rise.